Filed 11/5/24  P. v. Guizar-Figueroa CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F085758 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. BF137124A) |
| HUMBERTO GUIZAR-FIGUEROA, | **OPINION** |
| Defendant and Appellant. | |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

J. Edward Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Louis M. Vasquez and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]        Before Poochigian, Acting P. J., Smith, J. and DeSantos, J.

# INTRODUCTION

Appellant Humberto Guizar-Figueroa contends on this appeal that the trial court abused its discretion when it denied his petition for resentencing under Penal Code section 1172.1.[1] Upon review of the record, we affirm the court's decision to deny recall and resentencing.

# FACTUAL SUMMARY

On June 6, 2011, at around 8:30 p.m., Donald Younger was watching television at home with his wife and daughter when their front door suddenly opened. Appellant and his brother V. entered the house, pointed handguns at them, and yelled at them to get down and " 'shut up.' " Donald stepped in front of his wife and daughter to protect them and told the intruders to " 'shoot me' " and " 'kill me' " instead. Appellant and V. kept yelling at him to sit down. Donald's wife was also yelling and kept telling the men to get out of their home. With all the yelling, the intruders told Donald, " 'now your family is in danger.' " When Donald's wife started to hyperventilate, the men let her to go to the kitchen and get a drink.

V. told Donald that they wanted him to take them to his pawn shop so they could take the cash and gold. Donald explained the money and gold was in a safe that was on a timed lock that could not be opened until 8:00 a.m. Appellant was on his phone several times talking to an unknown third subject. The intruders came up with a plan to wait at the residence until 8:00 a.m. when Donald could drive them to the pawn shop, while the third subject would wait at the residence with the wife and daughter. After taking what they wanted from the pawn shop, they would return Donald to his residence and leave without hurting his family. Donald would have to wait 20 minutes before calling the

---

[1] Hereinafter, undesignated statutory references are to the Penal Code.

police and reporting the incident. V. threatened Donald by reminding him that they knew where he lived and worked and what vehicles he drove.

While waiting, appellant and V. continuously walked through the residence and pointed their guns at Donald and his family. They opened doors and closets looking for valuables. Donald knew his parents had also been in the residence, but he did not see them during the incident.

Donald's father had actually escaped out the back door of the residence when appellant and V. entered the house yelling at them to get on the ground. Donald's father called 911 from a neighboring house and reported the home invasion robbery. Law enforcement arrived at approximately 8:50 p.m. and set up a perimeter around the house. The third subject noticed and called appellant on the phone to tell them that sheriff's deputies were outside the residence. V. told Donald to go out the front door and tell law enforcement that everything was okay. When Donald went out the front door to speak with the sheriff's deputies, appellant and V. ran out the back. This allowed Donald's wife and daughter to run out the front door towards the sheriff's deputies.

Law enforcement apprehended appellant and V. when they ran outside and confiscated cellphones, money, loaded handguns and spare loaded magazines. V.'s phone contained pictures of himself, appellant, money, handguns, and assault rifles. Pictures showed the serial numbers of two handguns that were the exact handguns recovered from the robbery. There were pictures of appellant and V. brandishing what appeared to be the same handguns used in the robbery. The phone also contained pictures of jewelry display cases, a video of what appeared to be the jewelry cases at Donald's pawn shop, and a chart showing the purity of gold per karat in various countries.

Appellant told law enforcement that an unknown third subject forced him and V. to rob the family by threatening appellant's family in Mexico. Appellant said the third subject provided them with the handguns, told them to go to this house, to tie up the

family, and make the man take them to the pawn shop where they could steal cash and gold.

However, V. told law enforcement a different version. V. said that he and appellant chose to rob the house because they wanted the money to have fun. V. said they were with a man named Alex who they met in Washington state. Alex gave V. the pistol for the robbery. V. admitted that they were driving through Bakersfield when they saw the pawn shop and decided it would be fun and exciting to rob it. They had heard of a similar plan in Washington and decided to copy it. The three of them came up with the plan to follow the owner of the pawn shop to his house. The plan was to take the owner of the pawn shop from his house to the shop to get the money. The plan was not to hurt anyone and to leave as soon as they got the money. V. admitted he knew the gun was loaded but said it was only used as a tool.

After entering the residence and yelling at the occupants, V. saw the people were really scared. He learned that one of the family members had cancer and she was very upset. V. said he tried to calm things down by telling them they would not hurt them and by putting their guns away so that it would be less traumatic on the family.

V. later changed his story and told law enforcement that Alex was with the Sinaloa drug cartel and they held appellant and V.'s family hostage in Mexico. Alex forced him and appellant to commit the robbery by threatening to kill their family. V. said he believed Alex because he tried to reach his father and sister by phone, but they did not answer. When asked if there would be a log of the calls on his phone, V. responded that he always erased his call history. V. said Alex told them to take money, guns, and gold from the pawn shop, and that if anyone resisted, they were to assault them. V. said Alex provided them with the guns and ammunition. They went into the pawn shop four days prior to the robbery and purchased earrings. When asked about the money he and appellant had with them when arrested, V. said that was travel money from their father.

4.

V. explained that he lied initially because he was protecting his father and sister, and that he is telling the truth now because he learned they were safe.

## PROCEDURAL SUMMARY

Appellant was charged with three counts of kidnapping (§ 209, subd. (a)), one count of residential burglary (§ 460, subd. (a)), and three counts of assault with a semiautomatic weapon (§ 245, subd. (b)). It was also alleged that appellant personally used a firearm in the commission of the kidnapping and assault charges (§§ 12022.53, subd. (b), 12022.5, subd. (a)), the kidnapping and assault charges were serious felonies (§ 1192.7, subd. (c)(8), (20)), and the residential burglary committed in the presence of another person was a serious and violent felony (§§ 667.5, subd. (c)(21), 1192.7, subd. (c)(18)).

On May 16, 2014, appellant entered into a plea agreement where he pled no contest to the three charges of assault with a semiautomatic weapon and admitted the firearm enhancement as to those charges in exchange for the dismissal of the other counts and allegations and an aggregate stipulated prison term of 33 years. At the sentencing hearing on June 12, 2014, both parties agreed to set aside the plea and enter into a new plea agreement. Again, appellant pled no contest to the three assault charges and admitted the three attached firearm enhancements in exchange for dismissal of the other counts and allegations and a reduced aggravated stipulated prison term of 29 years eight months. Appellant was sentenced to state prison for 29 years eight months as follows: nine years for the first assault charge, plus 10 years on the firearm enhancement; a consecutive term of two years for the second assault charge, plus three years four months on the firearm enhancement; and a consecutive term of two years for the third assault charge, plus three years four months on the second firearm enhancement.

On May 9, 2022, the trial court received a letter from the Department of Corrections and Rehabilitation (CDCR) recommending that appellant's sentence be

recalled pursuant to section 1172.1, subdivision (a)(1).[2] The court appointed counsel for appellant and set the matter for a status conference. On September 6, 2022, appellant filed a sentencing statement with points and authorities regarding resentencing under section 1172.1. Appellant asked the court to exercise its discretion to strike the three gun enhancements and resentence him to 13 years. The district attorney's office filed a brief opposing the motion on the grounds that appellant represented an unreasonable risk of danger to public safety. On February 10, 2023, the court held a hearing and denied appellant recall and resentencing. On February 14, 2023, appellant filed a timely notice of appeal.

## DISCUSSION

**The Trial Court Did Not Abuse its Discretion in Denying Recall and Resentencing Under Section 1172.1.**

Appellant claims that the trial court abused its discretion by denying him resentencing under section 1172.1. Appellant argues the court did not adequately consider the recommendation from the CDCR, his good track record in prison, his lack of criminal history, or his childhood trauma. The People disagree and contend there was sufficient evidence to support the court's finding that appellant posed an unreasonable risk of danger to public safety. The People also contend that even if the court failed to consider one or more factors, any error was harmless because remand would not reasonably likely produce a more favorable result for appellant. We conclude the court did not abuse its discretion.

### Relevant Factual and Procedural Background

On February 10, 2023, the trial court held a hearing to decide whether to recall appellant's sentence pursuant to section 1172.1, based on the letter of recommendation from the CDCR. The court announced it had read and considered the evidence, the

---

[2] Formerly section 1170.03, subdivision (a)(1).

6.

various briefs from both sides including the numerous exhibits, and stated that its tentative finding based on section 1172.1, subdivision (b)(2) was to deny recall. The court acknowledged that section 1172.1, subdivision (b)(2) afforded appellant a presumption favoring recall and resentencing, which could only be "overcome if the Court finds [appellant] is an unreasonable risk of danger to public safety, as defined in subdivision (c) of [s]ection 1170.18." The court also noted that section 1170.18, subdivision (c) defines an unreasonable risk of danger to public safety as " 'an unreasonable risk that [appellant] will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of [s]ection 667,' " commonly referred to as the " 'Super Strikes.' "

The trial court highlighted the positive changes appellant had made, including certificates earned and other efforts to rehabilitate and become a productive and law-abiding member of society. There was a plea agreement in which appellant pled guilty to three counts of assault with a semiautomatic firearm and admitted allegations for personal use of a firearm. Appellant was 24 years old when he committed the offense and had spent nine years in prison. The court noted appellant was 36 years old at the time of the hearing, but that the research showed criminal involvement diminished after an individual reached 40 years old. The court noted it was to consider postconviction behavior as indicative of rehabilitation. However, appellant had not been a model prisoner based on his two violation writeups for refusing an officer's orders in 2016, and for possession of a cellphone in 2018, where he smashed the cellphone rather obey the order to hand it over, and then refused to be handcuffed. For parole suitability, appellant had been advised to participate in vocational programs, consider gaining marketable skills, participate in programs such as victims' awareness/impact, denial management, and criminal thinking, and attend groups addressing his causative factors.

The trial court next considered appellant's conduct that gave rise to the conviction, which was "a home invasion, armed with firearms, holding people in the house hostage."

The court deemed it a particularly "heinous crime, considering all the circumstances." Appellant intended to keep the people hostage until the next day so that they could access the safe at the pawn shop, which the court viewed as "creat[ing] considerable risk to the life of the persons in that home." The court then noted that appellant created a considerable potential for great violence under these circumstances, where it was "very possible" that people in the house would have resisted or tried to flee, resulting in appellant using his firearm to enforce compliance with his order, "causing death or great bodily injury." Appellant had incentive to take the plea deal of only 29 years eight months when he was facing life in prison with parole.

Thus, the trial court made a tentative ruling that appellant still had a long way to go before it could find that "there's no longer an unreasonable risk to public safety," per section 1172.1, subdivision (b). He only served nine years of the sentence, had not been a model inmate, had been disciplined at least two times, and had not completed vocational programs that would make him a better consideration for parole.

The trial court gave both sides the opportunity to address its tentative ruling. Appellant's counsel disagreed that the underlying conduct that gave rise to the conviction indicated he was likely to do this again. He argued that the court should consider factors that may have contributed to his conduct such as his age, his lack of criminal history, and that he acted on behalf of someone else's direction. Concerning his vocational training, appellant argued that because he does not speak English, he was limited in available programs. Regarding his time in prison, appellant argued that he matured since the cellphone incident, that it did not entail violence, and that he had not committed violence at any time while in custody. Thus, appellant argued, this showed he did not pose a danger if released and asked the court to grant a resentencing hearing.

The trial court prefaced its ruling by noting again that appellant had done some positive things while in prison that showed he was "hopefully, on the path to rehabilitate and to eventually be released to live in the public with society." However, the court

explained, in "considering the dangerousness of the crime that he was convicted of, as well as all the circumstances, I just consider that he created such a risk to the safety of the people in that house, and there was a real—it was very likely that someone would be injured or killed if they either disobeyed the orders of the kidnappers or if they attempted to flee. And I just find that that behavior and the fact that he was 24 years old, I don't—I know that he's a youthful offender, but 24 is a more mature age than 18. And the fact that he would be willing to engage in that type of criminal conduct I just find poses an ongoing risk of danger to the public. [¶] And he's not—he hasn't aged out in the sense that the studies we're talking about people—the risk starts going down by age 40 and goes down even more by age 50. He hasn't been in prison long enough or achieved an old enough age that I'm satisfied that that risk is reduced in any significant way. [¶] So I'm going to confirm my tentative [ruling]. I do find that [appellant] is an unreasonable risk of danger to public safety, as defined in subdivision (c) of [s]ection 1170.18, and that there is an unreasonable risk that he would commit a new violent felony within the meaning of [section] 667, as I've discussed earlier, if he is resentenced. So the Court is denying the petition to recall his sentence."

**Standard of Review**

A court of appeal reviews a trial court's discretionary resentencing determinations, including a decision denying the CDCR's resentencing request pursuant to section 1172.1, for an abuse of discretion. (*People v. Frazier* (2020) 55 Cal.App.5th 858, 863 (*Frazier*), superseded by statute on other grounds as stated in *People v. McMurray* (2022) 76 Cal.Ap..5th 1035, 1041 (*McMurray*); *People v. McCallum* (2020) 55 Cal.App.5th 202, 211, superseded by statute on other grounds as stated in *McMurray*, at p. 1041.) "The abuse of discretion standard 'involves abundant deference' to the court's ruling." (*People v. Jefferson* (2016) 1 Cal.App.5th 235, 243; *McCallum*, at p. 211.) To establish an abuse of discretion, an appellant must show that the court's decision fell outside the bounds of reason, making it arbitrary, capricious, or absurd. (*People v.*

*Johnson* (2022) 12 Cal.5th 544, 605–606; *People v. Jordan* (1986) 42 Cal.3d 308, 316 [The court's exercise of discretionary power should not be disturbed unless the court "exercised its discretion in an arbitrary, capricious, or patently absurd manner that results in a manifest miscarriage of justice."].)

A trial court can abuse its discretion when its decision is inconsistent with the letter and the spirit of the law, or based on circumstances that are not relevant or otherwise constitute an improper basis for decision. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847, superseded by statute on other grounds as stated in *People v. Lynch* (2024) 16 Cal.5th 730, 756–757; *People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977–978, superseded by statute on other grounds as stated in *People v. Lynall* (2015) 233 Cal.App.4th 1102, 1008.) "A trial court abuses its discretion when its factual findings are not supported by the evidence, or its decision is based on an incorrect legal standard." (*People v. Thai* (2023) 90 Cal.App.5th 427, 433, citing *People v. Knoller* (2007) 41 Cal.4th 139, 156.)

A court of appeal reviews issues regarding interpretation of law de novo. (*In re Hogan* (1986) 187 Cal.App.3d 819, 823; *In re A.S.* (2018) 28 Cal.App.5th 131, 144.)

**Applicable Law**

Section 1172.1, subdivision (a)(1) states, "When a defendant, upon conviction for a felony offense, has been committed to the custody of the Secretary of the [CDCR] …, the court may, on its own motion, within 120 days of the date of commitment …, at any time upon the recommendation of the secretary …, recall the sentence and commitment previously ordered and resentence the defendant in the same manner as if they had not previously been sentenced …."

"In recalling and resentencing pursuant to this provision, the court shall consider postconviction factors, including, but not limited to, the disciplinary record and record of rehabilitation of the defendant while incarcerated, evidence that reflects whether age, time served, and diminished physical condition, if any, have reduced the defendant's risk

for future violence, and evidence that reflects that circumstances have changed since the original sentencing so that continued incarceration is no longer in the interest of justice. Evidence that the defendant's incarceration is no longer in the interest of justice includes, but is not limited to, evidence that the defendant's constitutional rights were violated in the proceedings related to the conviction or sentence at issue, and any other evidence that undermines the integrity of the underlying conviction or sentence. The court shall consider if the defendant has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence, if the defendant was a victim of intimate partner violence or human trafficking prior to or at the time of the commission of the offense, or if the defendant is a youth or was a youth as defined under subdivision (b) of [s]ection 1016.7 at the time of the commission of the offense, and whether those circumstances were a contributing factor in the commission of the offense." (§ 1172.1, subd. (a)(5).)

The CDCR's recommendation that a defendant's sentence should be recalled and the defendant should be resentenced furnishes the trial court with jurisdiction it would not otherwise have to recall and resentence, and is an invitation to the court to exercise its equitable jurisdiction. (*Frazier*, *supra*, 55 Cal.App.5th at p. 866; *People v. Codinha* (2023) 92 Cal.App.5th 976, 987; *McMurray*, *supra*, 76 Cal.App.5th at p. 1040.) "The Secretary's request for recall and resentencing pursuant to section [1172.1], subdivision [(a)](1) … provides no statutory entitlement to relief to the inmate even when the court credits the postconviction facts identified in the Secretary's recommendation materials." (*Frazier*, at p. 866; see *People v. Gibson* (2016) 2 Cal.App.5th 315, 324 [the language is permissive, not mandatory]; *People v. McCallum*, *supra*, 55 Cal.App.5th at p. 206 [the Legislature did not require a court to hold a hearing before acting on a recommendation by the Secretary for recall and resentencing]; § 1172.1, subd. (a)(1) [the court "may" recall the sentence and resentence].) "The Secretary's recommendation letter is but an invitation to the court to exercise its equitable jurisdiction." (*Frazier*, at p. 866.)

11.

Effective January 1, 2022, Assembly Bill No. 1540 (2021–2022 Reg. Sess.) "clarified the Legislature's intent regarding procedural requirements" and "added a presumption in favor of recall and resentencing" when a request for resentencing is submitted. (*McMurray*, *supra*, 76 Cal.App.5th at p. 1038; *People v. Vaesau* (2023) 94 Cal.App.5th 132, 142.) Thus, section 1172.1 now requires a trial court to "state on the record the reasons for its decision to grant or deny recall and resentencing," and provides that "[r]esentencing shall not be denied … without a hearing where the parties have an opportunity to address the basis for the intended denial or rejection." (§ 1172.1, subd. (a)(7), (9); *Vaesau*, at pp. 142–143.) Now, when the CDCR recommends recall and resentencing, the court is required to hold a hearing, state on the record its reasons for its decision, provide notice to the defendant, and appoint counsel for the defendant. (§ 1172.1, subds. (a)(7), (b)(1); *McMurray*, at p. 1040.) The Legislature explained that "[i]t is the intent of the Legislature for judges to recognize the scrutiny that has already been brought to these referrals by the referring entity, and to ensure that each referral be granted the court's consideration by setting an initial status conference, recalling the sentence, and providing the opportunity for resentencing for every felony conviction referred by one of these entities." (Stats. 2021, ch. 719, § 1, subd. (h).) The Legislature's intent was thus to "ensure" that the Secretary's referral was given "court[] consideration," meaning by "providing the opportunity for resentencing." (*Ibid.*; *People v. Braggs* (2022) 85 Cal.App.5th 809, 819.)

Therefore, where a resentencing request is made, "[t]here shall be a presumption favoring recall and resentencing of the defendant, which may only be overcome if a court finds the defendant currently poses an unreasonable risk of danger to public safety, as defined in subdivision (c) of [s]ection 1170.18." (§ 1172.1, subd. (b)(2); *McMurray*, *supra*, 76 Cal.App.5th at p. 1040.) Section 1170.18, subdivision (c) defines an " 'unreasonable risk of danger to public safety' " as "an unreasonable risk that [appellant]

will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of [s]ection 667."

**Analysis**

Upon review of the record, the trial court's findings are supported by the evidence and based on correct legal standards. (See *People v. Thai*, *supra*, 90 Cal.App.5th at p. 433.) Thus, we conclude the court did not abuse its discretion in denying appellant's resentencing. (*Frazier*, *supra*, 55 Cal.App.5th at p. 863.)

The trial court considered postconviction factors as set forth under section 1172.1, subdivision (a)(5), including the circumstances of the case, appellant's youthful age at the time of the offense, the length of the sentence that was served, and appellant's current age. The court acknowledged that appellant had made positive changes while in prison. The evidence submitted in the letter from the Secretary of the CDCR, had "a lot of positive things to see about [appellant's] conduct in state prison, about different efforts he has been making to rehabilitate and to get to the point where he would be able to be released on parole, hopefully, and become … a law-abiding member of our community." The court also acknowledged the positive evidence submitted in appellant's sentencing statement, which included "certificates that [appellant] has achieved." However, based on his two write-ups while in prison, the evidence also supported the finding that appellant was not a model prisoner. Evidence that appellant had not completed vocational programs and other training important for returning to society, such as impulse control, criminal thinking, lack of empathy, and anger control, supported the court's finding that appellant was not as suitable for parole.

Contrary to appellant's assertion, the trial court also considered appellant's youthful status under section 1172.1, subdivision (a)(5). The court expressly acknowledged that at 24 years old, appellant was a youthful offender at the time he committed the offense. The court's consideration that a 24 year old posed a different risk than an 18 year old was a reasonable comparison and not improper. (See Assem. Com.

13.

on Public Safety, Analysis of Assem. Bill No. 1308 (2017–2018 Reg. Sess.), as amended Mar. 30, 2017, p. 2 [the prefrontal cortex, which is responsible for decision making and impulse control, "doesn't have nearly the functional capacity at age 18 as it does at 25."].)

The trial court noted that it had read and considered appellant's September 6, 2022 sentencing statement with its points and authorities, which contained, among other things, evidence of appellant's past "psychological, physical or childhood trauma, including, but not limited to, abuse [or] neglect …." (See § 1172.1, subd. (a)(5).) Thus, appellant fails to show the court did not consider evidence of appellant's childhood trauma that contributed to the commission of the offense.

Last, the record shows the trial court was aware of the presumption in favor of recall and resentencing of appellant, which may only be overcome if a court finds appellant is an unreasonable risk of danger to public safety. (See § 1172.1, subd. (b)(2).) The court acknowledged that such presumption could only be overcome "if the Court finds [appellant] is an unreasonable risk of danger to public safety," meaning that " '[appellant] will commit a new violent felony within the meaning of clause (iv) of subparagraph ([C]) of paragraph (2) of subdivision (e) of [s]ection 667.' " (See § 1172.1, subd. (b)(2).) The court discussed the circumstances of the offense and found it to be a particularly "heinous crime, considering all the circumstances." It was a home invasion, and appellant and his brother were armed with firearms, holding people hostage in the house. Appellant intended to keep the people hostage until the next day so that they could access the safe at the pawn shop, which the court viewed as "creat[ing] considerable risk to the li[ves] of the persons in that home." The court noted that appellant created a considerable potential for great violence by intending to hold the victims hostage overnight, creating a "very possible" risk that people in the house would have resisted or tried to flee, which could have resulted in appellant using his firearm to enforce compliance with his order, "causing death or great bodily injury." The evidence

14.

the court relied on—i.e., the likeliness that someone could have been killed or injured, that at 24 years old, appellant was willing to engage in that type of criminal conduct, that he had not reached the age where criminality goes down according to the studies, and that he had not been in prison long enough or achieved or participated in enough classes—supports the court's conclusion that appellant still posed an unreasonable risk of danger to public safety, as defined in subdivision (c) of section 1170.18.

Appellant's dispute with the trial court's evaluation of the facts of the case are not grounds for reversal. Although appellant claimed that he committed the crime under duress, the evidence did not support his claim. Appellant's brother admitted to law enforcement that they planned the robbery because they wanted the money to have fun. Evidence retrieved from cellphones showed appellant posing with the weapons used in the robbery, and contained images from the pawn shop showing they scoped it out in advance. In addition, appellant admitted he intended to tie up the family once he entered the home, and that he intended to keep Donald and his family hostage overnight until Donald could open the safe in the morning. Although appellant said he told them he would not hurt them, appellant was pointing a loaded gun at the victims. Under these circumstances, the court's conclusion there was considerable potential for great violence was well founded.

Accordingly, the trial court's decision was reasonable based on the evidence and was not decided in an arbitrary, capricious, or patently absurd manner. (See *People v. Johnson*, *supra*, 12 Cal.5th at pp. 605–606.) Thus, appellant fails to show the court abused its discretion.

## DISPOSITION

We affirm the judgment.